IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 5:19CR66 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID A. NESTOR, | ) | UNITED STATES' SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | (Redacted) |

The United States of America, by its counsel, Justin E. Herdman, United States Attorney,

and Carol M. Skutnik, Assistant United States Attorney, respectfully submits this memorandum

setting forth the United States' position regarding the sentencing for Defendant David A. Nestor.

For the reasons set forth below and those to be articulated at the sentencing hearing, the United

States submits that a Guidelines sentence is appropriate in this case.

Respectfully submitted,

JUSTIN E. HERDMAN
United States Attorney

By:    /s/ Carol M. Skutnik
       Carol M. Skutnik (OH: 0059704)
       Assistant U.S. Attorney
       Suite 400, U.S. Courthouse
       801 West Superior Avenue
       Cleveland, Ohio 44113–1852
       Tel. No. (216) 622-3785
       E-mail: carol.skutnik@usdoj.gov

# I.    **FACTUAL BACKGROUND**

To support its sentencing position, the United States offers the following summary of Defendant Nestor's conduct. The United States also refers the Court to the description included in the Presentence Investigation Report ("PSR").  (R. 17: PSR, PageID 59-61).

### A.    NESTOR ENGAGES IN OFFENSIVE CHATS WITH AN UNDERCOVER OFFICER AND DISTRIBUTES CHILD PORNOGRAPHY

On October 30, 2018, New York State Investigator Gregory Schmitter (hereafter "UC") was acting in an undercover capacity on a dating website known as Meet24.  Meet24 is known to the New York State Police and other law enforcement agencies as a forum where people often trade child pornography.  The UC was located in Waterloo, New York and had posted a profile on Meet24 identifying the UC as a 13 year old female residing in the Rochester, New York area.

That same day, Nestor responded to the profile identified as a thirteen year old girl. Nestor used the username "vampyre790," and claimed he was 22 years old (he was actually 39 at the time) and living in Navarre, Ohio.  The UC responded to Nestor in a UC capacity portraying himself as a 35 year old male with a 9 year old niece.  Below are the chat conversations that took place between UC and Nestor between October 30, 2018, and December 10, 2018:



**DN: Hi there. How r u doing?**

UC: Good man. ▮▮▮▮▮▮▮▮…what are you into

**DN: young girls and** ▮▮▮▮▮▮▮▮▮▮

UC: Nice you active?

**DN: Not anymore w em.** ▮▮▮▮▮▮▮▮▮▮**. trying to find a girl w a preteen that she plays w also**

UC: dam that sucks bro. How old were they??

**DN:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

UC: Damn. To bad they are gone. My ██████ Shes hot bro

**DN: (sent image of two clothed young females)**

**DN: that was them**

UC: Damn how old is she in the glasses

**DN: ██████**

UC: Getting older

**DN: Yep. And getting curves 2**

UC: I like em before the curves lol

**DN: Yeah me 2. what's ur niece look like?**

UC: (sent image of clothed adult male and juvenile female with faces concealed)

UC: No face shots…obviously

**DN: Damn she looks cute. bet she has cute ass**

UC: Sweet sweet ass

**DN: I bet. Wish I could have a night w her**

UC: If you were close by we could probably set something up but looks like you are far out there…

**DN: Yeah I'm in Ohio**

UC: We are in NY by rochester…

**DN: nice**

UC: If you ever make it around here…lol

**DN: lol right. how do u keep her quiet so she doesn't tell her parents?**

UC: ██████████████████████████. So shes gone most of the time. She knows its our secret or she cant live w me anymore or see her mom any more

3

**DN: Oh very well played. u ever have her join u and ur gf when u have one?**

**DN: (Image sent depicting two prepubescent females sitting on chair. A male is standing beside the chair and is ejaculating on the prepubescent females.  The female in the blue shirt has her finger inserted into the vagina of the partially clothed female in the pink shirt.**

_____

UC: Bored as hell. Wish I could find someone around here into the same stuff you know…so many fakes on here that jsut wanna rp or some stupid stuff

**DN: Yeah ik. I have 1 girl near me that plays w her son, he is 4, that I'm trying to hook up w. she wants me to try and rape/fuck her niece**

UC: No way. You should get all over that. Got pics??

**DN: I'm trying to but she is very sick right now.**

UC: Lame

**DN: image**

DN: image

DN: image

DN: image\

**DN: That's her. I can't find the pic of her son**

UC: Not bad

**DN: lil bigger than I;m used to But I wanna help her son play w her and me also**

UC: Nice. Shoud send me pics

**DN: if I get chance I will**

UC: Aight

**DN: where's ur ▮▮▮?**

UC: IDK ██████████ picker her up from school…probably be home soon I guess

**DN: Damn that sux. How often u get to play with her?**

UC: Usually I don once or twice a week. Try not to get carried away you know. She gets hurt

down there and goes to school and someone notices im screwed

**DN: Yeah that's very true**

**DN: do you know of any other sites w ppl similar interests?**

UC: Use to use kik but they shut everything down its so annoying…you?

_____

**DN: https://cloud.mail.ru/public/██████████**

(This link containing child pornography was shared on 11/3/2018)

**DN: take a look at these see if you like**

UC: K Im not going to get a virus or something am i

**DN: No. It's in Russian but vids r nice**

UC: Nice Ill check it out

**DN: k**

UC: Keeps freezing up when I try

**DN: Damn wonder why**

UC: Idk my phone sucks…feel free to send it on here. but Ill keep trying

**DN: there r like 100s of vids in that link**

UC: Damn

**DN: Yeah and a lot of em very young 2**

UC: Wtf I cant get it to work. Do I need a password of something??

**DN: No just copy and paste into search bar.**

5

**DN: www.dropbox.com/sh/**████████████████████████████

(This link containing child pornography was shared on 11/3/2018)

**DN: https://c loud.mail.ru/public/**████████████

**DN: cloud.mail.ru/public/**████████████

(This link containing child pornography was shared with UC on 11/3/2018)

**DN: try tge last one see it works any better**

UC: That drop box one worked bro/ Looked at some this am. Good stuff

**DN: cool. glad it worked**

**DN: (Image sent depicting prepubescent female on her hands and kness wearing a pink shirt with her jean and underwear pulled down exposing her buttocks and vagina.)**

(This image was sent on 11/5/2018)

**DN: www.dropbox.com/sh/**████████████████████████

(This link containing child pornography was shared on 11/5/2018)

**DN:**

**https://www.dropbox.com/sh/**████████████████████

**DN:**

**https://www.dropbox.com/sh/**████████████████████

(These links containing child pornography were shared with UC on 11/5/2018)

UC: more good stuff???

**DN: Yes.**

UC: Ill check it in a bit. Thanks bro? If you ever get out this way I owe you a freebie with ██

██ .

_____

6

**DN: u get any pix of** ███ **?**

**DN: (Sent image depicting a nude prepubescent female lying on her back with her hands**

**holding her legs in the air exposing her buttocks and vagina.)**

(Image was sent on 11/20/2018

**DN: mega.nz/#**████████████████████████

(This link containing child pornography was shared on 12/5/2018 or 12/6/2018)

UC: Good link?

**DN: yeah**

UC: Cant get it to work

**DN: www.dropbox.com/sh/**████████████████████

████████████

**www.dropbox.com/sh/**████████████████████████

(These links containing child pornography were sent on 12/10/2018)

————————————

**DN: Nice. How was is fucking her?**

UC: Bro you know its so dman good. so tight

**DN: bet it is. U fuck her ass yet?**

UC: Nah. I don't want to tear her up like that…Not gonna

**DN: very true**

      B.     <u>NESTOR IS IDENTIFIED</u>

On November 1, 2018, a subpoena was issued to Meet24 by Inv. Schmitter.

On November 2, 2018, Inv. Schmitter received the subpoena results and learned the email

account associated with the Meet24 "vampyre790" account was dnestor7980@███.com. The

7

results also revealed the IMEI number for the device and that the IP address used to access the account was 174.255.16.135 and it belonged to Verizon Wireless. The records also revealed Nestor had logged into his "vampyre790" account 251 times between the dates of October 15, 2018 and November 2, 2018.[1]

A subpoena was served on Verizon Wireless for the IMEI number and Inv. Schmitter learned that telephone number 989-███-█ was associated with the device utilized on the Meet24 account. The device was identified as a Tracfone Wireless cell phone. Subpoena results received from Tracfone Wireless, Inc. did not include subscriber information but listed the email address of Dnestor7980@███.com. Further investigation into a second email address "vampyre7969@███.com" revealed the email address was also associated with David Nestor.

The initial investigation into David Nestor indicated he lived in the State of Florida. However, Investigator Schmitter learned from geolocation software that Schmitter was likely located in Navarre, Ohio. On January 8, 2019, Investigator Schmitter contacted FBI TFO Bryan Allen and requested assistance in locating David Nestor. An FBI Operations Specialist was able to locate a female in the Navarre, Ohio area who previously shared an address with Nestor in Florida.

TFO Allen then contacted the Navarre, Ohio Police Department and requested a records check to determine if Nestor had been contacted by Navarre Police and if an address had been obtained. Detective Jason Fisher of the Navarre Police Department provided TFO Allen with a police report that indicated Nestor was contacted by police on November 28, 2018 and provided the address of ███ Bender, ███, Navarre, Ohio. On January 11, 2019, TFO Allen spoke with

---

[1] See Attachment A

the manager of the property and learned that he had been living at that residence for the past 6 months with his uncle and either mother or grandmother.

C.    EXECUTION OF THE SEARCH WARRANT

On January 22, 2019,  the FBI executed a federal search warrant at ■ Bender Street NE, Navarre, Ohio, in the Northern District of Ohio.  The agents seized a Samsung cellphone from Nestor's bed located in the living room.



D.    NESTOR'S INTERVIEW

Nestor admitted to TFO Allen that he used the mobile application Meet24 to communicate with a man in Rochester, NY about his niece and also about having sexual activity with a 9 year-old female.  Nestor also stated he chatted with a subject in the New York area and spoke of having access to a 4 year old in the ■ area.  Nestor further admitted that he claimed he was active with a 13 year old female, ■ in

Florida.  Nestor admitted to chatting with others about "child sex fantasy stuff" and told agents

that this talk was pure fantasy and he had never had physical contact with a juvenile.

Nestor admitted to using the Meet24 app to access other individuals with interests in

child pornography.  He stated the people he chatted with on the app were into child pornography

and shared child pornography with others through Dropbox links.  Nestor admitted to sending

Dropbox and cloud links to the subject in New York that contained child pornography.  He also

stated that other child pornography was located on his cell phone.

E.    THE FORENSIC REVIEW OF NESTOR'S CELLPHONE

TFO Bryan Allen forensically examined Nestor's Samsung cellphone and recovered a

total of 820 files that depicted child pornography, including 14 videos and 806 images.  The files

included images of infants and toddlers, as well as minors subjected to bondage, sadomasochistic

behavior, oral sex, vaginal intercourse, masturbation, and the lascivious exhibition of the genital

area.  These included the following representative images:

Image ID Number: 198-0
Description: The image depicts a prepubescent female engaging in oral to genital
intercourse with a male subject.

Image ID Number: 211-0
Description: The image depicts an infant child engaged in oral to genital
intercourse with a male subject.

Image ID Number: 219-0
Description: The image depicts a partially nude prepubescent female inserting her
finger into her vagina.

Image ID Number: 284-0
Description: The image depicts a nude prepubescent female wearing a mask with
her wrists bound engaging in oral to genital intercourse with a male subject.

Image ID Number: 4782-0
Description: The video depicts a male subject vaginally raping a nude toddler
female.  (The video is 1m 25s in length)

II.      **APPLICABLE LEGAL STANDARDS**

A.      LEGAL PRECEDENT FOR GUIDELINE SENTENCE

The United States requests a guideline sentence in this case consistent with the law and research highlighting the danger posed by child pornography offenders. Numerous courts have emphatically expressed the wretched consequences of child pornography. In United States v. Goff, 501 F.3d 250, 258-59 (3rd Cir. 2007), the Third Circuit noted:

> Children are exploited, molested, and raped for the prurient pleasure of [defendant] and others who support suppliers of child pornography.  These small victims may rank as anyone else in [defendant]'s mind, but they do indeed exist outside his mind.  Their injuries and the taking of their innocence are far too real.  There is nothing casual or theoretical about the scars they will bear from being abused for [defendant]'s advantage.

The defendant in United States v. MacEwan, 445 F.3d 237, 249-50 (3rd Cir. 2006), tried to downplay his receipt of child pornography by claiming that he was not a violent offender or a trafficker of guns or drugs.  The Third Circuit was not persuaded, reasoning as follows:

> Congress found that where children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years. Moreover, Congress found little distinction in the harm caused by a pedophile, be he a distributor or mere consumer in child pornography, because the mere existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children. Furthermore, it inflames the desires of . . . pedophiles . . .  who prey on children, thereby increasing the creation of and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials.

Id. (citations omitted); see also United States v. Duhon, 440 F.3d 711, 718-20 (5th Cir. 2006); United States v. Yuknavich, 419 F.3d 1302, 1310 (11th Cir. 2005); United States v. Grosenheider, 200 F.3d 321, 332-34 (5th Cir. 2000).

The Court in United States v. Cunningham, 680 F. Supp. 2d 844, 847 (N.D. Ohio 2010), *affirmed* 669 F.3d 723 (6th Cir. 2012), imposed a guideline sentence on a child pornography

defendant. In denying the defendant's challenge to the legitimacy of the child pornography guideline, the same one that applies to Nestor, the court reasoned:

> There can be no keener revelation of a society's soul than the way in which it treats its children. Given the current statistics surrounding child pornography, we are living in a country that is losing its soul.
>
> Child pornography is a vile, heinous crime. Mention the term to your average American and he responds with immediate disgust and a sense of unease. However, once it enters the legal system, child pornography undergoes sterilization. The sterilization goes far beyond properly removing emotion from sentencing decisions. Images are described in the most clinical sense. Victims all too often remain nameless. The only emotions on display are those of defendants, sorry that their actions were discovered by law enforcement.

In United States v. Norris, 159 F.3d 926, 929-30 (5th Cir. 1998), *cert. denied*, 526 U.S. 1010 (1999), the defendant claimed that children depicted in child pornography are not victimized by receipt. Rather, the defendant claimed that the victimization occurred solely when the child pornography was produced. Id. The Fifth Circuit thoroughly repudiated that argument as follows:

> Norris takes an unrealistically narrow view of the scope of harms experienced by the child victims of the child pornography industry. Unfortunately, the victimization of the children involved does not end when the pornographer's camera is put away. The consumer, or end recipient, of pornographic materials may be considered to be causing the children depicted in these materials to suffer as a result of his actions in at least three ways.
>
> *First*, the simple fact that the images have been disseminated perpetuates the abuse initiated by the producer of the materials. [T]he materials produced are a permanent record of the children's participation and *the harm to the child is exacerbated by their circulation*. . . . The consumer who merely or passively receives or possesses child pornography directly contributes to this continuing victimization.
>
> *Second*, the mere existence of child pornography represents an invasion of the privacy of the child depicted. Both the Supreme Court and Congress have explicitly acknowledged that the child victims of child pornography are directly harmed by this despicable intrusion on the lives of the young and the innocent . . . The recipient of child pornography obviously perpetuates the existence of the images received, and therefore the recipient may be considered to be invading the privacy of the children depicted, directly victimizing these children.

*Third*, the consumer of child pornography instigates the original production of child pornography by providing an economic motive for creating and distributing the materials.  As Congress put it in explicit factual findings:

> [T]he existence of and traffic in child pornographic images . . . inflames the desires of child molesters, pedophiles and child pornographers, thereby increasing the creation and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials.

Plainly, Congress has described a chicken-and-egg scenario in which it would be impossible to determine whether child pornographers or consumers of child pornography were initially responsible for the creation of the child pornography industry.  The underlying point, however, is that there is no sense in distinguishing, as Norris has done, between the producers and consumers of child pornography.  Neither could exist without the other.  The consumers of child pornography therefore victimize the children depicted in child pornography by enabling and supporting the continued production of child pornography, which entails continuous direct abuse and victimization of child subjects.

Norris, 159 F.3d at 929-31 (emphasis in original) (citations omitted).

A.     THE STABENOW MYTHOLOGY AND THE SENTENCING COMMISSION REPORT

Nestor concedes that Guidelines calculations in the PSR are correct but attempts to discredit the child pornography guidelines overall.  The attacks advanced by Nestor are not new and stem from a memo prepared in 2008 by Troy Stabenow, an Assistant Federal Public Defender from the Western District of Missouri, called Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines.  Essentially, Stabenow opined that § 2G2.2 was based on emotional fears rather than empirical study, and thus resulted in every offender receiving the statutory maximum sentence.  Central to his thesis was the notion that child pornography offenders are not as dangerous as Congress thinks.

Shortly thereafter, a district court in Wisconsin glommed onto the opinion piece, lifting whole sections in support of a variance.[2]  Very quickly, additional courts latched on to the opinion piece, using it to support their "policy disagreements" with the § 2G2.2 guideline.[3]  Other courts, however, have since scrutinized the Stabenow argument, and found it failing in many respects.

For example, the Court, recognizing that there is no dispute that certain enhancements apply in nearly every child pornography case, still rejected the a priori assertion that "frequency of application" equates to "lack of utility."[4]  Indeed, the Court observed "the frequency of the enhancements was expressly acknowledged by the Commission when it set the base offense levels for these offenses."[5]  Moreover, the court expressly rejected the "frequency of application" as a negation of the § 2G2.2 guideline by noting that an opposite conclusion should be drawn instead: "[T]he fact that more than fifty percent of offenders have over 300 images and that over sixty-percent have sadistic and masochistic images supports a conclusion that even more harsh sentences are required for deterrence."[6]  The court handily exposed another central flaw in the Stabenow argument:

> The assertion that sentences should be reduced because it is easy to accumulate a large number of pictures quickly also rings hollow. The Court does not dispute that it is very likely that a defendant

---

[2] United States v. Hanson, 561 F. Supp. 2d 1004, 1005 (E.D. Wis. 2008).  Interestingly, Hanson engaged in conduct that the United States Sentencing Commission has since determined should be considered as aggravating (discussed below), such as active communication with other offenders.

[3] See United States v. Grober, 595 F. Supp. 2d 382, 394 (D.N.J. 2008) aff'd, 624 F.3d 592 (3d Cir. 2010) (listing decisions that used the research in Stabenow's post).

[4] United States v. Cunningham, 680 F.Supp.2d 844, 851–853 (N.D. Ohio 2010).

[5] Id. at 851-852.

[6] Id. at 852-853.

could acquire more than 600 images with just a few mouse clicks and several emails. But that number of images is not collected by accident. Instead, those images are sought out by a troubled mind, from like-minded individuals. Thus, a defendant makes a cognitive choice to seek out that level of images. Moreover, the Court has never before seen an argument that because a crime is easy to commit, it should be punished less severely. Robbery is certainly simplified from the criminal's perspective by the use of a firearm and the choice of a feeble, elderly victim. The Guidelines, however, do not lessen punishment because the crime was easier to commit. In fact, seeking out a vulnerable victim leads to a 2–level enhancement under the Guidelines. U.S.S.G. § 3A1.1(b)(1). This Court, therefore, will not alter its sentence simply because accessing and growing a database of child pornography has become easier as technology has advanced.[7]

After opinions such as the above, the Stabenow opinion piece has been largely replaced by the United States Sentencing Commission's 2012 "Report to Congress: Federal Child Pornography Offenses" (hereinafter, The Report).[8]  The argument remains largely the same: the § 2G2.2 guideline should be abandoned because every offender gets every specific offense characteristic ("SOC"), such that § 2G2.2 fails to meaningfully distinguish between dissimilar offenders with every offender receiving a sentence that is too harsh.  This argument is also advanced by Nestor in his sentencing memorandum.

To be certain, the Report does not counsel that courts abandon the § 2G2.2 guideline in its entirety, or even to disregard certain SOCs within the guideline.  Nor does the Report identify

---

[7] United States v. Cunningham, 680 F.Supp.2d at 851–53 (emphasis in original); see also United States v. Johnson, 765 F. Supp. 2d 779, 782 (E.D. Tex. 2010) ("Gratuitous attacks on the Guidelines or Congress by a defendant for 'policy reasons' add nothing to the analysis of a particular case, or to the law in general. Claiming that there is a disparity between the Guidelines sentence for a first-time offender who has visually raped numerous children and one who has possessed illegal drugs ignores congressional intent to 'avoid unwarranted sentence disparities among defendants ... guilty of similar conduct.'").

[8] The Report is available online at: http://www.ussc.gov/news/congressional-testimony-and-reports/sex-offense-topics/report-congress-federal-child-pornography-offenses

so-called "empirical defects" within the guideline.  The Report does confirm, however, that there is widespread and growing sentencing disparity in § 2G2.2 cases.[9]  Further, the Report observed that "no offender or offense characteristics appeared to account for these practices in most cases."[10]  To put another way, district courts have failed to explain why they vary downward and what factors distinguished one offender from another, leaving the USSC to simply guess at ways to improve the guideline.

Even so, the Report does recommend the following amendments to § 2G2.2:

> The Commission believes that the following three categories of offender behavior encompass the primary factors that should be considered in imposing sentences in §2G2.2 cases:
>
> 1)  the content of an offender's child pornography collection and the nature of an offender's collecting behavior (in terms of volume, the types of sexual conduct depicted in the images, the ages of the victims depicted, and the extent to which an offender has organized, maintained, and protected his collection over time, including through the use of sophisticated technology);
>
> 2) the degree of an offender's engagement with other offenders — in particular, in an Internet "community" devoted to child pornography and child sexual exploitation; and
>
> 3) whether an offender has a history of engaging in sexually abusive, exploitative, or predatory conduct in addition to his child pornography offense.[11]

To be clear, the Commission still found value in many of the current SOCs , as reflected in the first category.  The Commission observed, "the current scheme places insufficient emphases on other relevant aspects of collecting behavior as well as on offenders' involvement

---

[9] The Report, Chapter 12, p.317.

[10] Id. at 318.

[11] Id. at 320.

16

in child pornography communities and their sexual dangerousness."[12]   The Commission specifically referenced the current SOC for number of images as outdated, but still maintained the volume of images was an important factor.  Importantly, the Commission observed "[a]t the same time, [the guideline] results in unduly lenient ranges for other offenders who engaged in aggravated collecting behaviors not currently addressed in the guideline, who were involved in child pornography communities…"[13]   Put another way, the Commission observed that district courts fail to adequately account for aggravating factors.

To be clear, the 2012 Report neither counsels nor encourages this Court or any other to abandon the § 2G2.2 guideline.  Indeed, the guideline remains the starting point for fashioning a sentence that avoids unwarranted sentencing disparities.[14]   To the extent that the Report addresses limitations of the § 2G2.2 guideline, it also speaks to the district courts' failures to adequately identify and consider aggravating conduct that is not captured in the guideline.

For instance, in this case, the defendant "engaged with other offenders in an Internet "community" devoted to child pornography and child sexual exploitation, resonating with the Report's second proposed amendment.  Nestor was in a "dating" application specifically looking for other individuals interested in child pornography.  Therefore, the findings in the Report are not favorable to Nestor.

To the extent the defense will argue that certain SOCs are inherent to the crime, the Government responds that SOCs are not inherent to the crime, but instead track more closely to investigative strategies.  Given the limitations or resources (stretched ever thinner by the

---

[12] Id. at 321.

[13] Id.

[14] Gall v. United States, 552 U.S. 38, 49 (2007).

increasingly routine appearance of exceedingly large computer storage for analysis),

investigations have tended to focus on certain types of offenders, i.e., the worst of the worst. The

reason for that focus is simple: it tends to reveal the most dangerous offenders, allowing law

enforcement to interrupt or prevent the ongoing abuse of children. In this case, the investigative

strategy revealed an offender trading child pornography with other sex offenders in an app

frequently devoted to the exploitation of children.

> While it is absolutely true that the § 2G2.2 guideline is higher than it was in the 1990s, both Congress and the courts have access to more and better information about child pornography offenders. In fact, recent research published in the Journal of Sexual Aggression demonstrates that Congress's so-called "meddling" in § 2G2.2 was justified:

> Crimes involving the possession, distribution, or manufacture of child pornography constitute violations of specific laws pertaining to the receipt and transmission of child abuse/exploitation images, and as a result there is a tendency for some individuals to assume these offenders are somehow distinct from child molesters (i.e., 'hands-on' abusers). This assumption, in fact, is a key reason why recent years have seen an increase in judicial sentences that fall below sentencing guidelines (United States Sentencing Commission, 2012), a trend that may be attributable to an impression that the rate of 'crossover' between child pornography collection and hands-on abuse is low (Eke & Seto, 2011; Endrass et al., 2009; Seto, Hanson, & Babchishin, 2011).

> The logic of this conceptual view is somewhat befuddling. It ignores the observation that individuals who molest children and those who download and masturbate to child pornographic images share a primary motivational pathway - both are sexually aroused by minors (Seto et al., 2006). It therefore should come as no surprise that offenders whose sexual fantasies and urges involve children are able to derive pleasure and gratify their deviant impulses through a variety of means, and it suggests that significant 'crossover' may exist between these crimes.

> Although some research (Elliott, Beech, Mandeville-Norden, & Hayes, 2009; Howitt & Sheldon, 2007; Webb, Craissati, & Keen, 2007) has shown differences between groups of 'online' and 'offline' offenders, most is limited by an important assumption;

> that is, an individual is a hands-off offender simply because
> official records do not reflect contact sexual offending. This
> assumption appears unwise, given the base rates for detecting
> sexual abuse are extraordinarily low, the finding that most victims
> of abuse never report their victimization to law enforcement, and
> the low percentage of arrests leading to convictions (Centers for
> Disease Control and Prevention, 2010; National Centers for Policy
> Analysis, 1999; US Department of Justice, 2010, 2012).
> *Researchers should never assume an offender has not committed a
> hands-on crime merely because his or her criminal record does not
> reflect such a charge or conviction.* [15]

This study goes on to describe its own processes as well as results.  The study was

comprised of 127 persons under investigation for the possession, receipt, or distribution of child

pornography who agreed to take a polygraph examination regarding their hands-on activity.[16]

These individuals had no known history of hands-on offending.[17]   Six individuals (4.7%)

admitted to sexually abusing at least one child prior to the polygraph.[18]   However, during the

polygraph procedures, an additional 67 individuals (52.8%) of the study sample provided

disclosures about hands-on abuse they had perpetrated.  That means a total of 57.7% of the

sample admitted to *previously undetected hands-on sexual offenses*.[19]   For children and judges,

that percentage gives worse odds than a coin-toss.  Even more shocking is the total number of

hands-on victims for these 73 individuals:  282 children, nearly four per offender.[20]

---

[15] M.L. Bourke, et. al., "The use of tactical polygraph with sex offenders," *Journal of Sexual Aggression* (2014), p. 5-6 (emphasis added).

[16] Id. at 8.

[17] Id.

[18] Id.

[19] Id.

[20] Id. at 9, Table I.

This study is important because it supports the results of prior studies, i.e., that child pornographers have high rates (as high as 85%) of previously unreported sexual offenses against children.[21]  This should come as little surprise, as other studies that relied solely upon prior official reports (arrests or convictions) showed a 20-28% association between child pornography offenses and contact sex offenses.[22]  Despite these peer-reviewed studies that support lengthy sentences, some courts continue to view these offenders as simple voyeurs of relatively low risk, cowing to the hyperbolic and distinctly un-empirical criticisms of the § 2G2.2 guideline, using those criticisms as the sole basis for variance.

The United States does not ask the Court to use the Bourke study, or any of the studies discussed, as proof of uncharged crimes.  However, the United States does ask the Court to

---

[21] Michael L. Bourke & Andres E. Hernandez, "The 'Butner Study' Redux: A Report on the Incidence of Hands-On Child Victimization by Child Pornography Offenders," 24 *Journal of Family Violence* 183 (2009) (study of 155 federal child pornography offenders in the United States who participated in the residential sex offender treatment program at FCI Butner from 2002–05; finding that official records, including the offenders' presentence reports in their child pornography cases, revealed that 26% had previously committed a contact sex offense, yet finding that "self reports" of the offenders in therapy revealed that *85% had committed prior "hands on" sex offenses*)(emphasis added); see also The Report, Ch. 7, p. 173 ("The six self-report studies taken together reported a rate of *55 percent*.").

[22] Janis Wolak et al., "Child Pornography Possessors: Trends in Offender and Case Characteristics," 23 *Sexual Abuse: A Journal of Research & Treatment* 22, 33–34 (2011) (finding, based on 2006 data from surveys of approximately 5,000 law enforcement officials throughout the United States, that 21% of cases that began with investigations of child pornography possession "detected offenders who had either committed concurrent sexual abuse [offenses] or been arrested in the past for such crimes"); Richard Wollert et al., "Federal Internet Child Pornography Offenders — Limited Offense Histories and Low Recidivism Rates," in *The Sex Offender: Current Trends in Policy & Treatment Practice* Vol. VII (Barbara K. Schwartz ed., 2011) (based on a study of 72 federal child pornography offenders in the United States who were treated by the authors during the past decade, the authors found that 20, or 28%, had prior convictions for a contact or non-contact sexual offense, including a prior child pornography offense).

consider that these studies highlight the seriousness of the offense, as well as the rightness of

Congress's intervention.  These studies support the guideline, and indicate that lengthy and

substantial sentences for child pornography offenders are appropriate.  As a district court in the

Tenth Circuit recently observed, regarding one of the predecessors to the Bourke study:

> The Butner Study Redux has some purpose, however. When
> defendants come to Court and ask the Court to make some
> Kimbrough v. United States variance, and argue that the guideline
> range is too harsh, the Court is inclined to reject such arguments,
> based in part on the Butner Study Redux and other standards. *At
> the present time, the studies indicate a strong correlation between
> looking and touching in the past for many defendants, regardless
> whether the correlation is eighty-five percent or fifty-five percent.
> This correlation is disturbing. As long as the strong correlation
> remains unrefuted, there is no reason to have a substantive
> disagreement with the guideline range*.[23]

The Crisman court went on to observe:

> Congress, as the democratic branch, and the Commission, trying to
> express Congressional intent, has expressed this intuition with
> harsh sentences, in part to protect the public. The federal courts
> should be hesitant to disagree with this democratic expression by
> varying because of its own view of what sentences are needed to
> protect the public. If the Butner Study Redux turns out to be
> accurate, or even close to accurate, then lay people's intuition that
> people who engage in the socially deviant behavior of child
> pornography may engage in other socially deviant behavior *may be
> right all along*.[24]

The Crisman court did not have the benefit of the 2014 Bourke study.  The Crisman court also

did not have the benefit of yet another much more recent study by DeLisi, et al, involving federal

sex offenders.[25]

---

[23] United States v. Crisman, 39 F.Supp.3d 1189, 1255-1256 (D.N.M. July 22, 2014) (emphasis added).

[24] Id. at 1256.

[25] Matt DeLisi, et al., (2016),"The dark figure of sexual offending: new evidence from federal

The 2016 DeLisi study revealed that non-contact sex offenders, such as those convicted of possession of child pornography, are very likely to have a history of contact sexual offending.[26]   This study involved 119 federal sex offenders from 2010-2015, for which 69% reported a contact sex offense during polygraph examination, divulging 397 victims.[27]   Of the 119 participants, 57 had been convicted of only possession or receipt of child pornography.[28] More than half of the offenders in the highest number-of-victims category (10 or more) had been convicted of possessing or receiving child pornography.[29]   The two most prolific offenders – with 22 and 24 victims – were child pornography offenders.[30]   The study concluded "the current analyses indicate that child pornography offenders are significantly more severe than their instant conviction offense indicates.  More often than not, they are contact sexual abusers." [31]

These two studies show that "lay people's intuition" and Congress has been right all along.  These studies show that Congressional "meddling" in the § 2G2.2 guideline was justified. These studies demonstrate that earlier judicial reliance upon the Stabenow mythology was unfortunately misplaced.  Judicial variances downward, based solely upon a "policy disagreement" with the formulation of the § 2G2.2 guideline, are unsupportable if not irresponsible.  These studies demonstrate that continued entertainment of the mythology

---

sex offenders," *Journal of Criminal Psychology*, Vol. 6, Iss. 1, pp. 3 – 15.

[26] Id. at 11.

[27] Id. at 5, 7.

[28] Id. at 6.

[29] Id. at 7, 11.

[30] Id. at 11.

[31] Id.

propounded by the Stabenow op-ed piece only inures benefit to a uniquely homogenous offender group (white and male), which does not promote respect for the law.

On this last point, it is important to note that the arguments against the § 2G2.2 guideline have been co-opted from Kimbrough.[32]  In Kimbrough, the Supreme Court expressly contemplated the racially disparate treatment of African-American defendants in the "crack/powder cocaine 100/1 ratio" context.[33]   As the Supreme Court observed, because 85% of crack offenses in federal court were African-American, there was a widely held perception that it promotes unwarranted disparity *based on race*.[34]   The Supreme Court relied upon empirical research showing the dangers of crack were overstated.[35]

In the child pornography context, however, the Kimbrough argument has been turned on its head.  Despite empirical, peer-reviewed studies showing that these offenders are *more dangerous than perceived*, district courts continue to understate that danger by varying at an unusually high rate to the benefit of an offender group that is more than 80% white and male.[36]  While the United States does not advance a "reverse Kimbrough" argument, the United States argues against this Court finding the defendant's arguments as "quite forceful" or that they "may be correct."[37]   In light of newer research, this Court should reject any Stabenow-type arguments

---

[32] Appellant's Brief, p. 4, citing Kimbrough v. United States, 552 U.S. 85 (2007).

[33] Kimbrough v. United States, 552 U.S. 85, 98 (2007).

[34] Id.

[35] Id. at 97-98.

[36] The Report, Chapter 12, p. 317 (noting that, for FY 2011, "within range" sentences occurred in only 32.7% of cases under § 2G2.2, meaning two-thirds received a below-range sentence.); see also United States Sentencing Commission, Sourcebook of Federal Sentencing Statistics, Table 28 (only 442 of 1557 (28%) of offenders with a primary § 2G2.2 guideline received a "within range" sentence in FY 2015).

[37] United States v. Regan, 627 F.3d 1348 (10th Cir. 2010) (observing Stabenow-type arguments

as incorrect, non-material, and frivolous, and that further reliance upon them would "seriously affects the fairness, integrity, or public reputation of judicial proceedings" in a negative manner.[38] With the benefit of more recent, empirical, peer-reviewed studies referenced above, this Court should affirmatively disapprove of this type of argument.

## III.    SENTENCING GUIDELINES COMPUTATION

### A.    DEFENDANT QUALIFIES FOR ALL SENTENCING ENHANCEMENTS LISTED IN THE PSR, AND HIS TOTAL ADJUSTED OFFENSE LEVEL SHOULD THEREFORE BE 37.

Nestor argues that this Court should disregard several child pornography Guideline enhancements because they appear in most child pornography prosecutions. This argument ignores the fact that the Sentencing Commission deliberately set the base offense level at 22, purposefully leaving room for frequently applied enhancements in child pornography cases:

> The Commission determined that a base offense level of level 22 is appropriate for trafficking offenses because, when combined with several specific offense characteristics which are expected to apply in almost every case (e.g., use of a computer, material involving children under 12 years of age, number of images), the mandatory minimum of 60 months' imprisonment will be reached or exceeded in almost every case by the Chapter Two calculations.

U.S.S.G. App. C, Amendment 664, pp. 58-59 (emphasis added). As the Commission clearly stated, they set the base offense level at 22, contemplating that almost every case would have an enhancement for use of a computer, material involving children under 12 years of age, and

___

were "quite forceful" in dicta); United States v. Grigsby, 749 F.3d 908, 911 (10th Cir. 2014) (commenting that "defendant may be correct when he says the child pornography production guideline, § 2G2.1, suffers from the same apparent defect as the distribution guideline, § 2G2.2.").

[38] United States v. Ruiz-Terrazas, 477 F.3d 1196, 1199 (10th Cir. 2007).

number of images.  These enhancements were mandated by Congress, so the Commission

effectively built them into the base offense level by setting the base offense level lower than they

normally would have for an offense carrying a mandatory minimum five-year sentence.

The government submits that Defendant qualifies for all of the following sentencing

enhancements. With his total offense level being 37, the final adjusted offense level is 34 after

accounting for his Acceptance of Responsibility. (R. 17: PSR, PageID 62-63).  Additional

explanation is provided where necessary.

- **"Pursuant to §2G2.2(b)(2), if the material involved a <u>prepubescent minor</u> or a minor who had not attained the age of 12, increase by 2 levels." <u>Id</u>., at p. 6, ¶ 23.**
  Nestor possessed and distributed sexually explicit images that included babies and toddlers.

- **"Pursuant to §2G2.2(b)(3)(F), if the defendant knowingly engaged in <u>distribution</u>, increase by 2 levels." <u>Id</u>., at p. 6, ¶ 24.**
  Nestor admitted to using the app "Meet24"to access other individuals with interest in child pornography and that most of the people he chatted with on the app were into child pornography.  Moreover, Nestor engaged in a very graphic conversation with the UC involving sex with prepubescent minors followed by the dissemination of child pornography images and links to Dropbox folders full of child pornography images and videos.  Therefore, Nestor qualifies for the distribution enhancement.

- **"Pursuant to §2G2.2(b)(4), if the offense involved material that portrays (A) <u>sadistic or masochistic conduct</u> or other depictions of violence; or (B) <u>sexual abuse or exploitation of an infant or toddler</u>, increase by 4 levels." <u>Id</u>., at p. 6 ¶ 25.**
  Nestor possessed and distributed sexually explicit images that included a video of an adult male vaginally raping a toddler female, and an image of a prepubescent female wearing a mask with her wrists bound while being forced to engage in oral sex with an adult male.

- **"Pursuant to §2G2.2(b)(6), if the offense involved the <u>use of a computer</u> or an interactive computer service for the possession, transmission, receipt, or distribution of the material, or for accessing with intent to view the material, increase by 2 levels." <u>Id</u>. at p. 6 ¶ 26.**

Nestor used a smartphone to commit the instant offenses, which qualifies under the definition of a computer.  The use of computer penalty was enacted to curb the explosion of child pornography on the internet; the fact that internet pornography is so pernicious is not a basis to reduce penalties.  Indeed, there is no other area of criminal law where, when severe crime become more common, the penalties are reduced.  Therefore, this Court should impose a two level enhancement for the use of a computer.

25

When penalties for child pornography were first established, they were directed to the receipt and distribution of child pornography via the mails.  By the mid 1980's, law enforcement could confidently assert that it had the resources to address the distribution of child pornography and believed it to be on the decline.  Pornography distribution over the internet, however, emerged as its primary concern.  S. Rep. 99-537 at 44; H.R. Rep. 99-910 at 4-5; see also United States v. Williams, 553 U.S. 285, 306 (2008) ("child pornography harms and debases the most defenseless of our citizens.  Both the State and Federal Governments have sought to suppress it for many years, only to find it proliferating through the new medium of the Internet."). In 1995, Congress observed this emerging trend, finding "that as the use of computers and the use of electronic communications increase for people in business and personal use, it has, unfortunately, also increased for criminal use, including the sale of pornographic materials." 141 Cong.Rec. H4122-01 at H4123.  As a result, Congress sought not only to toughen penalties for child pornography and child exploitation, but also to address the impact of the rise of internet usage on these crimes.  Id.  It therefore enacted the Sex Crimes Against Children Prevention Act of 1995 (SCACPA), Pub. L. 104-71, directing the Sentencing Commission to raise the Base Offense Level and to add an enhancement in cases under 18 U.S.C. § 2251(c)(1)(A) or § 2252(a)(1)-(3) where a computer was used to "transmit the notice of" or "transport or ship" the images. H.R. REP. 104-90.  Congress provided ample justification for application of the enhancement not only to distribution, but also to receipt and possession.  While the Commission has subsequently suggested further refinements to the application of this minor enhancement, based on the greater impact of a large-scale distributor of pornography versus someone who downloaded pornography for his own use, Congress provided reasonable justification for applying the enhancement to any use of a computer, particularly emphasizing the difficulty of detecting consumption of child pornography.[39]

---

[39]  The House Judiciary Committee Report on SCACPA found that computer transmission of child pornography presented a threat to children: "Distributing child pornography through computers is particularly harmful because it can reach an almost limitless audience. Because of its wide dissemination and instantaneous transmission, computer-assisted trafficking is also more difficult for law enforcement officials to investigate and prosecute."  H.R. Rep. 104-90.  Furthermore, the use of a computer for transmission increases the likelihood that children may see the images and that "pedophiles may use a child's fascination with computer technology as a lure to drag children into sexual relationships."  Id.  Although these rationales apply to possession as well as distribution of pornography, the initial legislation proposed in the House only applied the enhancement for use of a computer to distribution.

Senators Grassley, Hatch, Thurmond, Thompson and Roth offered Amendment 595 to H.R. 1240, which included application of the enhancement for use of a computer to possession. 141 Cong. Rec. S5509-12, S5519-02.  Senator Grassley specifically spoke about the need to make penalties for various violations of child pornography statutes stronger when a computer was used, whether for distribution or for possession:

Computers are now the preferred business forum for child pornographers.  Due to modern technology, predatory pedophiles sell, purchase and swap the most vile depictions of children engaged in the most outrageous types of sexual conduct.

Moreover, the harms cause by the use of computers to commit this offense only increased in the next decade.  A bipartisan staff report of the House Committee on Energy and Commerce recently emphasized that, as the market for child pornography had exploded in the past 15 years through the Internet, and technology has enabled the exchange of greater number of images, child pornography has been increasing vastly in amount, and depictions are of younger children and more violent.[40]

The enhancement is now extremely common because the harm caused by the use of the computer in extremely common; use of a computer is not, however, any less pernicious than it was when Congress and the Commission first raised the possibility of an enhancement.  Instead, use of a computer is properly penalized more significantly that receipt or distribution by mail because of the far greater accessibility and spread of the images, as well as the vastly greater difficulty law enforcement had in detecting and stopping such crimes.

- **Pursuant to §2G2.2(b)(7), if the offense involved <u>600 images or more</u>, increase by 5 levels. <u>Id</u>. at p. 6 ¶ 27.**

    Nestor sent a Cloud.mail link to the undercover that contained 217 videos that predominantly qualified as child pornography.  He also sent a link to a Dropbox account that contained 60 videos and 25 image files that included child pornography.  In addition, Nestor's cellphone contained 14 videos and 806 images of child pornography.  Therefore, the offense involved more than 600 images resulting in the 5 level enhancement.

---

Simply put, child pornography on computers is dangerous and must be stopped. In the past, whenever State or Federal law enforcement agents arrested a child pornographer, or ring of child pornographers, they seized and then destroyed the child pornography. This kept child pornography out of the hands of child molesters and preserved the privacy of the children who had been so callously exploited. But now, because of digital computer technology, it is nearly impossible to actually destroy child pornography. That means there will be more child pornography for child molesters and less privacy for abused children. We in Congress must do something.  H.R. 1240 and the Grassley-Hatch-Thurmond amendment would discourage child pornographers from using computers to trade in child pornography. And when the U.S. Sentencing Commission reports to us this fall on how computer child pornographers are being punished, I will take a close look to see if there is anything the Senate can do to provide even more protection to children.

141 Cong. Rec. S5509-02.  The amended bill passed with unanimous consent in the Senate and then was sent back to the House.  There, Rep. Schumer explained that the Senate amendment better reflects the House's original intent: "this bill strengthens the punishment for sexual crimes involving children . . . . On behalf of the Crime Subcommittee, I am satisfied that the changes made in the other body actually strengthen the bill and I have no objection to them."  141 Cong. Rec. H14319-02.

[40]  <u>See</u> January 2007 bipartisan staff report of the House Committee on Energy and Commerce, "Sexual Exploitation of Children over the Internet,"109th Congress, 2nd Session.

B.    UNITED STATES V. HAVIS DOES NOT APPLY TO U.S.S.G. 2G2.2(b)(7) COMMENTARY.

The defendant's reliance on United States v. Havis, 927 F.3d 382 (6th Cir. 2019), to discredit the Sentencing Commissions' commentary for U.S.S.C. §2G2.2(b)(7) is misplaced.[41] In Havis, the issue before the Sixth Circuit was the Sentencing Commissions commentary to the career offender enhancement under § 4B1.2(b) which added attempt crimes to the definition of "controlled substance offense" when the text of the guideline itself "makes clear that attempt crimes do not qualify as controlled substance offenses."  Havis, at 387.  The Sixth Circuit held this particular Guideline commentary for the career offender enhancement was not binding on the court as "[c]ommentary binds courts only 'if the guideline which the commentary interprets will bear the construction.' " Havis, at 386 (quoting Stinson v. United States, 508 U.S. 36, 46, 113 S.Ct. 1913 (1993)).  This is because the Sentencing Commission's commentary "serves only to interpret the Guidelines' text, not to replace or modify it." Id. at 386 (emphasis in original).

Havis addressed a guideline section that is fundamentally different from the one at issue here.  Whereas the guideline commentary there effectively sought to add offenses that were not listed in the guideline text, the commentary here merely interprets a term in the existing text of the guideline.  Application Note 6(A) defines the term "images" and 6(B)(ii) describes how to determine the number of images when the file is a video or movie:

> (B)  Determining the number of images.- For purposes of determining the number of images under subsection (b)(7):
>
> (i)  Each photograph, picture, computer or computer generated image, or any similar visual depiction shall be considered to be one image.  If the number of images substantially underrepresents the

---

[41] Nestor fails to note that even without the application of the 75:1 ratio for videos, the five-level enhancement for more than 600 images applies.

number of minors depicted, an upward departure may be
warranted.

(ii)  Each video, video-clip, movie, or similar visual depiction shall
be considered to have 75 images.  If the lenghth of the visual
depiction is substantially more than 5 minutes, an upward
departure may be warranted.

Unlike the addition of a new offense applicable to the career offender enhancement in

Havis, this is an interpretation the Guideline provision will bear as is does not add to a list or

definition given in the text of the guideline.  See United States v. Buchanan, 933 F.3d 501, 514

FN2 (6th Cir. 2019) (Explaining that under Havis, application note 2 to § 4B1. is binding on

courts as it "explains the meaning of 'engaged in as a livelihood' in a way that the text of the

Guidelines provision will bear, rather than adding to a list or definition given in the text of the

Guidelines provision.")

As the Havis court itself recognized, binding precedent permits, and even requires,

sentencing courts to consider guideline commentary when calculating a defendant's advisory

guideline range.  Havis, 907 F.3d at 442; Stinson, 508 U.S. at 47 (where guideline commentary

"does not run afoul of the Constitution or a federal statute, and is not 'plainly erroneous or

inconsistent' with" the guideline it interprets, it is a "binding interpretation" for the courts);

United States v. Hernandez–Fierros, 453 F.3d 309, 313 (6th Cir. 2006) (application notes to

guidelines are to be given "controlling weight"); United States v. Jarman, 144 F.3d 912, 914 (6th

Cir. 1998) (same); United States v. Schwartz, 408 F. App'x 868, 871 (6th Cir. 2010) ("As part of

the commentary, application notes are likewise given controlling weight.").  And that is so even

if the amendment departs from "prior judicial construction."  Stinson, 507 U.S. at 46.

Here, the Application Note defining "images" clarifies how images are to be counted for

purposes of § 2G2.2(b)(7).  It is obvious that a video or movie depicting the sexual exploitation

of a child, with action and sound, should count for more than a still image of a child being

sexually exploited.  Therefore, Application Note 6(A) clarifies the interpretation of images found

in § 2G2.2 itself by clarifying how images are calculated in a manner consistent with the ratio of

frames per second in a movie.

> Whether digital or old-school film, video is a series of still images
> that, when viewed in order at a certain speed, give the appearance
> of motion.  Frame rate is the speed at which those images are
> shown and it's usually expressed as "frames per second," or FPS.
> Each image represents a frame, so if a video is captured and played
> back at 24fps, that means each second of video shows 24 distinct
> still images.
>
> For example, movies are usually displayed at 24fps, since this
> frame rate is similar to how we see the world, and creates a very
> cinematic look. Video that's broadcast live or video with a lot of
> motion, such as a sporting event or video game recording, will
> often have a higher frame rate, as there's a lot happening at once
> and a higher frame rate keeps the motion smooth and the details
> crisp.[42]

A ratio of 75 images per video seems like quite a bargain considering the minimum

industry standard of 25 frames per second.  Nevertheless, the Commentary at issue here (that

gives guidance on how to determine the number of images in a video clip) is not 'plainly

erroneous or inconsistent' with" the guideline it interprets.  Therefore, it is a "binding

interpretation" for this court.

IV.    **APPLICATION OF § 3553(A) FACTORS**

      A.    <u>NATURE AND CIRCUMSTANCES OF THE OFFENSE</u>

The Government refers to the Statement of Facts section herein and Defendant's PSR for

descriptions of the nature and circumstances of the offenses in the case at bar.

---

[42] "Frame Rate: A Beginner's Guide", available at TechSmith.com/blog/frame-rate-beginners-guide/

B.    HISTORY AND CHARACTERISTICS OF THE DEFENDANT

Defendant Nestor reports ████████████████████████████. ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████. ████████████████████████████

████████████████████████████████████████████████████████████████

████. The research does not support this claim.

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████,

31



Nestor also reports █████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
██████████████████████████████

First and foremost, ████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
██████████████████████████████████████

C.    NEED FOR THE SENTENCE IMPOSED TO REFLECT SERIOUSNESS OF
OFFENSE, PROMOTE RESPECT FOR THE LAW, AND PROVIDE JUST
PUNISHMENT

Nestor was not a passive observer or downloader of child pornography on the internet.

He was conniving and graphic in his conversations.  Nestor initially responded to the profile of a

13 year-old girl then thought he was talking to another deviant interested in having sex with

children so he goaded and encouraged the UC to sexually exploit a child.  That type of

conversation encourages the digital capture of the rape of children for others to enjoy.  Also,

Nestor's offense conduct was clearly not limited to his exchange with the UC.  Nestor had

amassed quite a collection of images and videos on his phone and had access to a trove of images

and videos stored in Dropbox and Cloud.  This didn't happen overnight.

In Bistline, the Sixth Circuit noted a reasonable sentence must reflect the seriousness of

the offense or provide for any general or specific deterrence. United States v. Bistline, 665 F.3d

767-68 (6th Cir. 2012). A sentence at or near the mandatory minimum would offend the

seriousness of the offense and the impact on its victims. Congress has plainly indicated "[e]very

instance of viewing images of child pornography represents a . . . repetition of their abuse."  18

U.S.C. § 2251 (Historical and Statutory Notes: Child Pornography Prevention of 2006, Pub. L.

No. 109-248, Title V, § 501, July 27, 2006, 120 Stat. 587, 623 (2006)).  The words of Congress

and many courts echo the victims themselves. For many victims, the downloading of images is

just as traumatic as the initial act of abuse. These victims express embarrassment of being

depicted in these extremely vulnerable situations. They also express fear of being watched and

subsequently recognized by people like Nestor who fixate on videos and images of them.

Defendant committed child exploitation offenses in the comfort and privacy of his own home, and he alone is responsible for his actions and the impact they have had on the children depicted in those images.

D.      NEED FOR SENTENCE TO AFFORD ADEQUATE DETERRENCE

Congress, the Supreme Court, and the Sentencing Commission believe general deterrence is a very important factor when considering an appropriate sentence. United States v. Irey, 612 F.3d 1160, 1206 (citing United States v. Ferber, 458 U.S. 747, 760 (1982) (The most expeditious if not the only practical method of law enforcement may be to dry up the market for [child pornography] by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product); Osbourne v. Ohio, 495 U.S. 102, 109-10 (1990) (It is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand); United States v. Goff, 501 F.3d 250, 261 (3rd Cir. 2007) (Deterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing.); United States v. Barevich, 445 F.3d 956, 959 (7th Cir. 2006) (The avenue Congress has chosen to weaken the child pornography industry is to punish those who traffic in it. Transporting and receiving child pornography increases market demand. The greater concern under the Guidelines is for the welfare of these exploited children.). In United States v. Goldberg, 491 F.3d 668, 672 (7th Cir. 2007), the court opined:

> Young children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded, consumed himself and disseminated to others. The greater the customer demand for child pornography, the more that will be produced. Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor. The logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so more will be produced.

In fact, the <u>Bistline</u> Court reversed a district court that failed to see any importance in general deterrence. <u>See</u> <u>United States v. Bistline</u>, 665 F.3d 758, 767 (6th Cir. 2012). The district court stated, "general deterrence . . . will have little [if] anything to do with this particular case." <u>Id</u>. The Sixth Circuit found "that [the district court's] statement is inexplicable, and in any event conflicts with our statement that 'general deterrence is crucial in the child pornography context[.]'" <u>Id</u>.  (citing <u>United States v. Camiscione</u>, 591 F.3d 823, 834 (6th Cir. 2010)).

Despite the fact that Nestor and others who have an overwhelming desire for young children may not be deterred even if the sentence for the crimes was life, it is also true that others would certainly not be deterred if Nestor received a low sentence. These offenders do talk to each other via the Internet and they are concerned enough about law enforcement that they encrypt their hard drives, seek foreign websites, and use anonymous phone apps in an effort to prevent detection.  There is much to be gained by a significant sentence—increased safety for our children.

## V.   **MONETARY PENALTIES**

### A.   FINE

The Government concedes Nestor does not have the current ability to pay a fine in this matter and suggests that an analysis of Nestor' future ability to make money should be directed toward his special assessment responsibilities.

### B.   18 U.S.C. § 3014 ADDITIONAL SPECIAL ASSESSMENT

Nestor is also subject to a mandatory $5,000 Additional Special Assessment under 18 U.S.C. § 3014.  The statute states, in pertinent part:

> Beginning on the date of enactment of the Justice for Victims of Trafficking Act of 2015 and ending on September 30, 2019, in addition to the assessment imposed under section 3013, **the court**

36

> **shall assess an amount of $5,000 on any non-indigent person or entity convicted of an offense under**—
>
> **(1)** chapter 77 (relating to peonage, slavery, and trafficking in persons);
>
> **(2)** chapter 109A (relating to sexual abuse);
>
> **(3) chapter 110 (relating to sexual exploitation and other abuse of children)**;
>
> **(4)** chapter 117 (relating to transportation for illegal sexual activity and related crimes)....
>
> 18 U.S.C. § 3014(a) (emphasis added).

These assessments are deposited in the Domestic Trafficking Victims' Fund and awarded as grants or enhanced programming for victims. 18 U.S.C. §§ 3014(c) and (e)(1). Because Defendant has been convicted of an offense under Chapter 110, the Court must impose this additional special assessment unless it finds he is unable to pay; however, both Defendant's current and <u>future</u> financial status is to be evaluated when making the indigency determination under § 3014. See <u>United States v. Shepherd</u>, 922 F.3d 753 (6th Cir. 2019). See also  <u>United States v. Janatsch</u>, 722 F. App'x 806, 810-11 (10th Cir. 2018). That is, negative net worth at the time of sentencing is not dispositive of the issue. <u>United States v. Kelley</u>, 861 F.3d 790, 801-802 (8th Cir. 2017). If "at some point" a defendant would be able to pay the Additional Special Assessment, "[t]his ability to earn money in the future preclude[s] a finding of indigence for purposes of § 3014." *Id.*

This is consistent with a similar finding by another Judge in this District on August 20, 2018 in <u>United States v. Phillip Carl</u>, case number 3:17CR159, in which the defendant was represented by a Federal Defender's Office due to a finding of indigency. The Court, relying on the PSR, found a present inability to pay, but found Carl was part-owner of property and also young enough that work following release was likely. <u>See also</u>, <u>United States v. Lail</u>, 2018 WL

2771112 (4th Cir. 2018), (imposition of the $5,000 assessment warranted based on future ability to pay following sale of defendant's house even though indigent at sentencing, represented by the Federal Defender, and unable presently to pay); United States v. Rodgers, 711 F. App'x 229, 230 (5th Cir. 2018) (citing United States v. Magnuson, 307 F.3d 333, 335 (5th Cir. 2002) ($5,000 assessment warranted where defendant had title to certain assets and potential employability sufficient to pay even though PSR found present inability to pay).  As the Tenth Circuit noted, "nothing in the statute precludes an examination of future ability to pay as part of a holistic assessment of the indigency determination."  United States v. Janatsch, 722 F. App'x 806, 810-11 (10th Cir. 2018).  On the contrary, as the Court in that case noted, "[the defendant]'s going to have plenty of time to pay that off while incarcerated."  Id. at 806, 810-11. That is precisely the case here.  Even in the absence of assets, Defendant will be in prison for at least the next 5 years, much longer if a Guideline sentence is imposed, and during that time, he can participate in the IFRP, which affords him the future ability to pay both the fine and additional special assessment.  In fact, the fine will not expire for 20 years from the date of his release from custody. 18 U.S.C. § 3613(b).  In addition, he demonstrates future potential employability, both in the institution and beyond, with which to make payments.  Nestor has maintained a consistent record of employment in years past and was working two jobs at the time of his arrest.  Consequently, Nestor should be ordered to pay the $5,000 additional special assessment.

## VI.    **CONCLUSION**

For these reasons and those to be articulated at the sentencing hearing, the United States respectfully requests that the Court impose a Guidelines sentence on David Nestor.

Respectfully submitted,

JUSTIN E. HERDMAN
Acting United States Attorney

By:    /s/ Carol M. Skutnik
Carol M. Skutnik (OH: 0059704)
Assistant U.S. Attorney
801 West Superior Avenue, Suite 400
Cleveland, Ohio 44113
Tel. No. (216) 622-3785
E-mail: carol.skutnik@usdoj.gov

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on December 4, 2019, copy of the foregoing Government's Sentencing Memorandum was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

<u>/s/ Carol M. Skutnik</u>
Assistant U.S. Attorney